MICHAEL TAYLOR,          )
                                      )

      Petitioner,       )
                                      )

      v.                 )      No. 13 CV 5183
                                      )

UNITED STATES OF AMERICA,   )      Judge Thomas M. Durkin
                                      )

      Respondent.     )

## MEMORANDUM OPINION AND ORDER

A jury convicted petitioner Michael Taylor of being a felon in possession of a firearm in violation of 18 USC § 922(g)(1) in 2011. Judge Der-Yeghiayan sentenced Taylor to 480 months' imprisonment. Taylor appealed, and the Seventh Circuit affirmed his conviction and sentence. Almost a year later in 2013, Taylor filed a letter on the district court's docket raising various "issues" with his trial. The district court recharacterized Taylor's filing as a petition for relief under 28 U.S.C. § 2255, and denied it. Then, four-and-a-half years later in January 2018, Taylor filed a petition to the Seventh Circuit seeking leave to file a second or successive Section 2255 petition. The Seventh Circuit dismissed Taylor's petition as unnecessary because the district court had failed to warn Taylor about the consequences of its characterizing Taylor's 2013 letter as a Section 2255 petition. Taylor subsequently filed the Section 2255 petition at issue in February 2018. The case was assigned to this Court. The Court has reviewed the parties' briefs and for the following reasons denies Taylor's petition.

## I.  Underlying Facts and Trial

### A.  The Shootings

Taylor's cousin, Daniel Starks, testified at Taylor's trial that Taylor purchased a 9-millimeter Beretta handgun in the summer of 2009 (the "Beretta"). Starks also testified that Taylor used it on a shooting spree in Aurora, Illinois in late November and early December 2009. According to Starks, Taylor first used the Beretta at a party on November 28 after Derrick Smith and Sean Parker threatened to murder Starks. Taylor told Starks that he shot the gun at the party that November night. Afterwards, Starks, Starks's girlfriend, and Javaris Yankaway, Starks's and Taylor's cousin, rode with Taylor to three Aurora, Illinois locations in Taylor's white Cadillac. Taylor shot the Beretta at each location in response to the events at the party. First, at an apartment in the 500 block of Ashland Avenue, second, at Smith's residence, and third, at Parker's residence. The shootings carried into the early morning hours of November 29.

On December 1, 2009, Starks, Taylor and Javaris were together at Starks's home when Roosevelt Yankaway, Starks' father and Taylor's uncle, arrived and told them that shots had been fired at his home the night before. According to Starks' testimony, this angered Taylor and he, Starks, Javaris and Roosevelt got in the same white Cadillac. Taylor drove, Javaris sat in the passenger seat, and Starks and Roosevelt sat in the back. Starks noticed the outline of a gun in Roosevelt's right pocket, the size and shape of which he testified were consistent with a .380 caliber

Bersa handgun (the "Bersa") he had previously seen Roosevelt carry. Starks saw Taylor shoot the Beretta and Javaris shoot a .357 revolver (the "revolver") at a blue Yukon near the Fourth Avenue and Ohio Street intersection in Aurora. The men then drove to Roosevelt's home. According to Starks, everyone exited the vehicle and began walking toward Roosevelt's driveway, when a police car approached.

### B.  Eyewitness, Police and Forensic Expert Testimony

Joselle Rosales was walking her dog near the Fourth Avenue and Ohio Street intersection on December 1, 2009 when she observed an exchange of gunfire between a white Cadillac and a dark sports utility vehicle. She could not see inside the Cadillac, but heard multiple shots, and immediately called the police. The Aurora Police Department dispatched several officers. Officer Greg Spayth arrived within minutes, blocked the streets, and reviewed and collected evidence. He observed two shell casings near the intersection, and bullet holes in two nearby homes.

Officers Damien Cantona, Robert Hillgoth and David Tellner also responded to dispatch that evening. They traveled directly to Roosevelt's home, believing that the shooting may have been in retaliation for a shooting Aurora Police Department officers had responded to there the night before (November 30) which also involved a light-colored Cadillac. When the officers pulled up to Roosevelt's residence on December 1, they saw three individuals—later identified as Taylor, Javaris and Roosevelt—standing near a light-colored Cadillac parked in the driveway of Roosevelt's home. The three men ran toward the backyard, then south across the backyard toward the immediately adjacent backyard ("Property A"). Officer Hillgoth,

who recognized Roosevelt, called out to him by name and began to chase the men on foot through the backyards. The other officers ran across the front yards, parallel to Hillgoth. Hillgoth found Roosevelt crouched near a vehicle parked on Property A. He and Officer Cantona began to handcuff him in the front yard. At the same time, the two officers saw Taylor and Javaris walking from the backyard of the property immediately south of Property A ("Property B") toward a parked white Cadillac. Officer Cantona handcuffed Taylor and Javaris. Starks fled from the scene, but was later arrested.

Police found the Bersa and a black ski mask under the tire of the vehicle near where Roosevelt had been found hiding on the driveway of Property A. They found the revolver in the backyard of Property B, and the Beretta and its magazine on a third property immediately adjacent to Property B ("Property C").

No fingerprints were found on the Beretta, but investigators performed a gunshot residue test on the hands of Taylor, Roosevelt and Javaris, and a forensic expert testified that the sample from Taylor's left hand was positive for gunshot residue. No gunshot residue was found on the hands of either Javaris or Roosevelt. Another forensic expert testified that the interior and the front and back driver's side of the white Cadillac also tested positive for gunshot residue. A third forensic expert who specialized in firearm identification testified that shell casings recovered on the evening of November 29, 2009 near the residence of Derek Smith and near an apartment complex in the 500 block of Ashland Avenue, and the shell casings recovered near the December 1, 2009 shooting at Fourth Avenue and Ohio Street had

all been fired from the Beretta. The jury found Taylor guilty of the felon in possession charge alleged in his indictment.

### C.   Starks's Testimony

In addition to testifying about Taylor's purchase of the Beretta, the shootings on November 28 and 29, and the shooting on December 1, Starks admitted at trial that he had initially testified at a government interview in January 2010 that he had no knowledge of the events on December 1. Starks later became a cooperating witness, but testified at trial to additional lies to the Government and grand jury. He also testified that he abused drugs and alcohol, sold crack cocaine for a living, and drank shots of cognac daily. He said that he would forget "small things" when he smoked marijuana and drank. He admitted to being nervous on the witness stand, but denied being high or drunk. He explained that the Government had granted him immunity for his testimony.

### D.   Sentencing

Prior to sentencing, the probation officer calculated Taylor's advisory guideline sentencing range of 262-327 months, and noted that he was subject to a mandatory minimum term of imprisonment of 15 years pursuant to the Armed Career Criminal Act. At the hearing and in its memorandum, the Government argued that Taylor's criminal history and offense conduct warranted an upward variance from the advisory sentencing guidelines. The Government specifically contended that the guideline range did not adequately consider the severity of Taylor's criminal history or the severity of his conduct in connection with the offense for which he had just

been tried. In response, Taylor's trial counsel—both in his sentencing memorandum and at the hearing—argued for the mandatory minimum sentence of 180 months based on various mitigating factors, including Taylor's difficult childhood, drug and alcohol abuse, family ties, and his desire to pursue continued education while in prison.

Taylor was sentenced on November 10, 2011 to 480 months' imprisonment, a 5-year term of supervised release, and a special assessment of $100. Taylor's sentence reflected an upward variance the court found warranted based on Taylor's extensive, violent criminal history, the "egregious" nature of the offense, Taylor's lack of remorse, danger Taylor posed to the public, and the need to promote specific and general deterrence. In so concluding, the court also considered a number of mitigating factors, stating by way of example:

> I've taken into account [Taylor's] indication that he had a rough childhood, that he has a ten-year-old daughter in Mississippi and that he helps care for a minor nephew with certain problems. I've also considered that the sentence faced by the defendant is much longer than any prior sentence he has previously served that he might serve in this case. I have also considered the defendant's indication that he was addicted to illegal drugs and alcohol which partially lead him to crime and his indication that he wants to be treated for his addictions and get a college degree and become a productive member of society.

10 CR 239, R. 112 at 47-48. The court indicated its intent to recommend to the Federal Bureau of Prisons that Taylor be able to participate in a residential drug abuse program if eligible, and ordered him to participate in a drug treatment program after release if he did not receive sufficient treatment while in prison.

## II.    Post-Trial Proceedings

### A.    Appeal

Taylor appealed his conviction and sentence, raising three principal issues: (1) that the district court erred in denying his motion *in limine* to exclude firearms from evidence; (2) that the government failed to present sufficient evidence to support his conviction; and (3) that his sentence was substantively unreasonable. The Seventh Circuit affirmed the verdict and the district court on all issues, and entered final judgment on November 30, 2012.

### B.    July 2013 Letter to the District Court

On July 16, 2013, Taylor filed a handwritten letter in the district court requesting assistance of counsel in a contemplated collateral attack. He attached a 35-page typewritten document describing "issues" that could be possible bases for such an attack, including that: (1) the evidence was insufficient to support a conviction; (2) the trial court did not allow newly appointed counsel enough time to prepare for trial; (3) the trial court erred in various rulings; (4) the Seventh Circuit erred in affirming both his conviction and sentence; and (5) Taylor's post-trial counsel was ineffective because he did not present certain legal arguments. In an August 15, 2013 order, the district court characterized Taylor's letter as a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, and denied both his request for counsel and for relief on the merits, concluding that Taylor had failed to make "a substantial showing of the denial of a constitutional right" as to any of his contentions. R. 3.

## C. Petition for Leave to File Second or Successive Section 2255 Petition

Just over four-and-a-half years later on January 16, 2018, Taylor filed a petition with the Seventh Circuit seeking leave to file a second or successive Section 2255 petition. Taylor sought to present newly discovered evidence of actual innocence, as well as to demonstrate his trial lawyer's ineffective assistance and various errors by the trial court—including its failure to appoint counsel to assist Taylor in pursuing his Section 2255 claims in the first place. The Seventh Circuit dismissed Taylor's petition as unnecessary, citing *Castro v. United States*, 540 U.S. 375 (2003), and holding that the district court erred in recharacterizing Taylor's July 2013 submission as a Section 2255 motion without warning Taylor that it would subject a later collateral attack to pre-approval. The court concluded that the district court's August 2013 order did not bar a fresh collateral attack.

## D. Section 2255 Petition

Taylor filed a Section 2255 petition on February 21, 2018. His petition was assigned to this Court, and raises three principal claims: (1) that his trial counsel's failure to investigate his defense and present expert testimony to rebut the Government's expert testimony violated his Sixth Amendment right to effective assistance of counsel and a fair trial; (2) that his trial counsel's failure to investigate and present mitigating evidence at sentencing violated his Sixth Amendment right to effective assistance of counsel and Fifth Amendment right to due process at sentencing; and (3) that newly discovered evidence of Starks's allegedly perjured testimony demonstrates his actual innocence. R. 4. The "newly discovered evidence"

was submitted in the form of a January 13, 2017 notarized statement by Starks purporting to summarize a July 26, 2016 interview between Starks and a private investigator named Andrea Van Wagenberg. That statement provides in full:

> To whom it may concern:
>
> I Daniel V. Starks was recently interviewed by a Private Investigator on behalf of Michael Taylor, who is presently incarcerated in the Federal Bureau of Prisons. I willingly answered questions by Ms. Andrea Van Wagenberg in regards of his case. I swear that the following statements are true and again given by me willingly, Daniel V Starks
>
> **Interview with Danny V Starks  7/26/16**
>
> -Danny will be finished with Parole in 2018
> -Danny has been "beefing" with Derrick Smith since before the incident. He does not know Sean Parker
> -Danny is affiliated with a gang
> -Danny has been arrested for both possession and burglary. Possession was his first offense and he got the lesser sentence for lying about Michael Taylor. After doing a short period of time for that he then got picked up for burglary and recently got out.
> -Danny originally lied on the stand as a government witness against his cousin because the police offered him a lesser sentence and money.
> -Danny thinks the police are still following him
> -Danny was pressured by an Officer Jake as he remembers
> -Danny said he would testify on Michael's behalf but needed to speak to his Parole Officer
>
> Submitted by- Andrea Van Wagenberg

R. 4-1. Taylor's petition contains no other context for or information about Starks's alleged statement.

## STANDARD

Section 2255 allows "a prisoner under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . [to] move the

court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). A criminal defendant is entitled to relief from his conviction and sentence if "the court finds . . . that there has been a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." *Id.* § 2255(b). Section 2255 relief is reserved for "extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013).

## ANALYSIS

### I. Timeliness

The Government argues that Taylor's motion should be denied as untimely. Taylor did not respond to the Government's argument. Indeed, despite that the Court granted Taylor multiple extensions of the time required to file his reply, Taylor did not file it. The Court will address the timeliness of each of Taylor's claims below, first under the applicable statute of limitations, and then under the "actual innocence" exception.

#### A. Under Section 2255(f)

Generally, a federal prisoner has one year from the date on which his judgment becomes final to file a Section 2255 motion. *See Clay v. United States,* 537 U.S. 522, 524-25 (2003); *Lombardo v. United States,* 860 F.3d 547, 551 (7th Cir. 2017); 28 U.S.C. § 2255(f)(1). A judgment is "final" for purposes of Section 2255(f)(1) when the Supreme Court affirms the federal appellate court, denies certiorari, or the time to

file a writ of certiorari lapses. *See Clay,* 537 U.S. at 527 ("Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires."). However, a claim alleging a constitutional violation based on newly discovered evidence may be filed later, generally within one year from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4).

Here, the Seventh Circuit's final judgment was entered on November 30, 2012. Taylor did not a file a petition for a writ of certiorari to the United States Supreme Court. Therefore, his conviction became final on February 28, 2013. Under Section 2255(f)(1), he then had until February 28, 2014 to file his Section 2255 motion. Taylor did not file his petition to the Seventh Circuit seeking leave to file the Section 2255 motion at issue until nearly four years later on January 16, 2018, and did not file the Section 2255 motion until February 21, 2018.

### 1. Ineffective assistance

The Government contends that Taylor's ineffective assistance claims are untimely because they were not raised within one year of his conviction becoming final, and no other statutory provision allows for a later filing. R. 21 at 16-18. Specifically, the Government argues that none of the facts underlying Taylor's claims of ineffective assistance based on failure to rebut expert testimony and/or failure to present adequate mitigating evidence at sentencing would have been unknown to him during the one-year filing period. *Id.*; 18 U.S.C. § 2255(f) (the one-year limitations

period commences the later of the date on which the conviction becomes final *or* when the factual predicate "could have been discovered through the exercise of due diligence"). The Court agrees. And although equitable tolling is available under Section 2255 when a petitioner shows that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance prevented timely filing, *Holland v. Florida*, 560 U.S. 631, 649 (2010), Taylor offers nothing to satisfy either requirement. As noted, he did not even respond to the Government's timeliness arguments. Accordingly, absent an applicable exception (discussed below), Taylor's ineffective assistance claims, filed nearly four years after the expiration of the statute of limitations, are untimely.

## 2. Actual innocence based on perjured testimony

The Government contends that any claim based on "newly discovered" evidence that Taylor's conviction was obtained through perjured testimony also is untimely because it was not raised within one year of his becoming aware of the evidence as Section 2255(f)(4) requires. R. 21 at 18-20. As noted, generally, a Section 2255 motion alleging a constitutional violation based on newly discovered evidence must be filed within one year from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). Both the due diligence requirement and the requirement that the defendant act promptly in asserting a claim are strictly enforced in favor of finality. *See Johnson v. United States*, 544 U.S. 295, 311 (2005) (Section 2255(f)(4) unavailable to petitioner, whose *pro se* status and purported lack of sophistication regarding

procedure did not excuse failure to take prompt, predicate action). It is the discovery of the fact, not the realization of its potential legal significance, that matters. *Wilson v. United States*, 413 F.3d 685, 687 (7th Cir. 2017).[1]

Starks's January 13, 2017 notarized statement purports to summarize his July 26, 2016 interview with investigator Andrea Van Wagenberg "on behalf of" Taylor. R. 4-1. But whether taking the July 26, 2016 date of the interview or the January 13, 2017 date on which Starks apparently signed the statement, Taylor's January 18, 2018 filing is untimely under Section 2255(f)(4).[2] Taylor makes no argument that he exercised due diligence in learning the facts upon which he now seeks to rely to allow the Court to reach the merits of his claims. The Court sees no basis from the record or the briefs to excuse Taylor's delay, and he does not offer one. Accordingly, Section 2255(f)(4) cannot save his claim.

---

[1] It is doubtful whether a petitioner may bring his "actual innocence" as a stand-alone claim under Section 2255. *See Arnold v. Dittman*, 901 F.3d 830 (7th Cir. 2018) ("[N]either the Supreme Court nor this court has yet indicated that an actual innocence claim could, standing alone, support the issuance of a writ in a non-capital case."); *see also Lund v. United States*, 913 F.3d 665, 668 (7th Cir. 2019) ("Framing the exception as a gateway presupposes that a petitioner will have underlying claims separate from the claim that he is actually innocent."). While Taylor's brief is far from a model of clarity on this point—referring to his "actual innocence" claim without referencing the violation of a specific Constitutional right—the Court assumes that he alleges a violation of his right to due process.

[2] The Court notes that the actual date Taylor discovered the "new evidence" of Starks's purported recantation was likely earlier still; it presumably took some time to set up the interview "on behalf of Michael Taylor," R. 4-1, and some additional time before that to discover the need for the interview in the first place.

## B.     Actual Innocence Gateway Exception

Having determined that Taylor filed his motion outside of Section 2255(f)'s one-year time limit, the issue becomes whether Taylor nevertheless qualifies for some exception allowing later filing. Although he does not say as much (and indeed does not directly address timeliness at all), Taylor apparently is relying upon his alleged actual innocence to overcome that bar. The so-called actual innocence exception is based in equity and allows a petitioner to proceed under Section 2255 notwithstanding its statutory time limits if he can demonstrate both: (1) a legitimate constitutional claim; and (2) a credible and compelling claim of actual innocence. *Schlup v. Delo*, 513 U.S. 298 (1995). As this standard suggests, "relief under § 2255 may not be available absent a constitutional or statutory error even if new evidence shows a factual injustice." *United States v. O'Malley*, 833 F.3d 810 (7th Cir. 2016) (citing *United States v. Evans*, 224 F.3d 670 (7th Cir. 2000)); *see also Perrone v. United States*, 889 F.3d 898, 903 (7th Cir. 2018) ("'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits" (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993))). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera,* 506 U.S. at 400.

Even assuming an underlying constitutional claim, "tenable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). Indeed, the

exception is available "only when a petition 'presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Id.* at 385, 401 (quoting *Schlup*, 513 U.S. at 316). A claim "must have the support of 'reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.'" *Arnold v. Dittmann*, 901 F.3d 830, 836 (7th Cir. 2018) (quoting *Schlup*, 513 U.S. at 324). And that evidence must make it "more likely than not that no reasonable juror would have convicted [the petitioner]." *Schlup*, 513 U.S. at 327.

Here, to demonstrate actual innocence sufficient to overcome the untimeliness of his claims, Taylor must show both that Starks perjured himself, and that no reasonable jury would have convicted him if Starks had not testified as he had. But in addition to this already high burden, Taylor must also overcome the fact that recantation testimony of the type on which he relies is typically viewed with skepticism. *Arnold*, 901 F.3d at 839 ("there are reasons to treat recantations generally with a healthy dose of skepticism"); *Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) (district court's skepticism about recantation "consistent with our own views of recantations in general"); *Dobbert v. Wainwright*, 468 U.S. 1231, 1233 (1984) (Brennan, J., dissenting) ("[r]ecantation testimony is properly viewed with great suspicion"); *United States v. Kamel*, 965 F.2d 484, 494 n.25 (7th Cir. 1992) ("Recanting affidavits and witnesses are viewed with extreme suspicion" (quoting *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991))).

Relying upon Starks's purported recantation is particularly difficult, because it leaves the Court with significantly more questions than answers. For example, Starks's statement does not indicate *what* he allegedly lied about at trial. *See* R. 4-1 (indicating that Starks "lied on the stand"). It does not indicate *who* offered the "money." *Id.* (indicating that "police" offered him "a lesser sentence and money").[3] It does not indicate *how much* was offered, or describe the terms of the deal. It does not indicate *when* or *where* the alleged proposal occurred. Nor does the statement specify whether the prosecutors were aware of such a proposal. And neither Taylor's petition nor Starks's statement explain the interview's timing or establish the statement's authenticity. Simply put, the Court is hard-pressed to conclude that these vague assertions render this case one of the "extraordinary" few ripe for relief under the "actual innocence" exception. *House v. Bell*, 547 U.S. 518, 538 (2006) (*Schlup* "permits review only in the extraordinary case"). The nearly five-and-a-half-year delay between conviction and recantation does not help. *See Arnold*, 901 F.3d at 837 ("Although any delay or lack of diligence by the petitioner in pursuing his claim of actual innocence is not a bar to the claim, it is among the factors that the court may consider in assessing the merits of the claim." (citing *McQuiggin*, 569 U.S. at 388-400)); *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015) ("a delayed petition 'should seriously undermine the credibility of the actual-innocence claim'" (quoting *McQuiggin*, 569 U.S. at 400. But there is more: while Starks's January 2017

---

[3] Starks's statement does indicate that an "Officer Jake" pressured him, but makes no effort to explain who this is, or how, when or why this occurred. R. 4-1.

statement indicates that he "lied on the stand" for the purpose of receiving money and a reduced sentence in his possession case, that is inconsistent with the fact that he had agreed to testify at trial in exchange for a grant of *immunity*. *See* 10 CR 239, R. 110 at 11-12.

Even setting aside the Court's questions about Starks's credibility, and even assuming that Starks intended to recant his *entire* trial testimony (which, as discussed, is not at all clear), Taylor has not shown that no reasonable jury would have convicted him absent Starks's allegedly perjured testimony. *See Perrone*, 889 F.3d at 908 (7th Cir. 2018) (no relief under actual innocence exception where petitioner "cannot carry his burden of showing that it is more likely than not that no reasonable juror would have voted to find him guilty beyond a reasonable doubt"). Indeed, the testimony of the multiple officers, several forensic experts, and the physical evidence alone are sufficient bases upon which a reasonable jury could convict Taylor. *Cf. Arnold*, 901 F.3d at 839 (allowing for evidentiary hearing where "[witness's] recantation, if it represents the truth, would by itself exonerate [petitioner] as a factual matter."). Moreover, at trial, the jury learned of Starks's drug and alcohol abuse, involvement in the underlying events, and grant of immunity, and Starks also was tested on both cross and recross examination, during which he was impeached with his grand jury testimony, among other things. 10 CR 239, R. 110 at 33-59, 64-65. The jury convicted Taylor notwithstanding any doubts they may have had about Starks's credibility. The actual innocence exception does not apply here.

To hold otherwise would invite witness recantations under a variety of scenarios *Schlup* does not condone.

## II. Merits

Having concluded that Taylor's claims were not timely, the Court need not reach the merits. *See Cooper v. United States*, 199 F.3d 898 (7th Cir. 1999) (declining to address the merits of a time-barred § 2255 habeas petition). For completeness, the Court will discuss them briefly in any event, beginning with his actual innocence claim.

### A. Actual Innocence Based on Perjured Testimony

Taylor urges the Court to grant relief under Section 2255 because unbeknownst to defense counsel, Starks accepted money in exchange for his false testimony at trial. R. 4 at 17-21. Taylor contends that but for Starks's testimony, there was insufficient evidence to support the jury's finding that Taylor was guilty of being a felon in possession of a firearm in violation of 18 USC § 922(g)(1). In response, the Government contends that Taylor's claim fails because he has not shown that Starks's testimony was false, alleged that the Government knew or should have known that Starks's trial testimony was false, or demonstrated that his allegedly false testimony affected the outcome at trial, pointing to the "substantial independent evidence" supporting the jury's verdict. R. 21 at 28-38.

"A conviction obtained through the knowing use of false testimony violates due process." *Morales v. Johnson*, 659 F.3d 588, 606 (7th Cir. 2011). To vacate a sentence on that basis, a petitioner must establish that: (1) there was false testimony; (2) the

prosecution knew or should have known that it was false; and (3) there is a likelihood that the false testimony affected the jury's judgment. *Id.* (citing *United States v. Freeman*, 650 F.3d 673, 677-79 (7th Cir. 2011)).

Even setting aside the Court's concerns about the credibility of Starks's 2017 statement, Taylor has not sufficiently alleged that the prosecution knew or should have known that Starks's trial testimony was false. Taylor argues in convoluted fashion that Starks's "recantation" (whatever that may be) is "more consistent with the other evidence at trial than his untruthful testimony was" (again, whatever portion of his testimony that may be). R. 4 at 18-20. And Taylor argues that Starks was the key witness at trial. *Id.* at 18. But at no point does Taylor contend that the Government was aware that Starks's testimony was false. And the Court doubts that Starks's allegation of having received "money" for his testimony alone is sufficient to demonstrate the Government's knowledge of false testimony. Starks's statement indicates only that "police offered him a lesser sentence and money," that Starks "thinks the police are still following him," and that he "was pressured by an Officer Jake as he remembers." R. 4-1. These vague assertions do not impute knowledge to the Government, even assuming they are true, and even assuming that a police officer's knowledge of perjured testimony could be attributed to the prosecution—an issue Taylor does not argue and has therefore waived. *See Holleman v. United States*, 721 F.2d 1136, 1139 (7th Cir. 1983) (affirming denial of Section 2255 motion to vacate and for evidentiary hearing in part because defendant's "motion itself fails to allege

the government's actual or constructive knowledge that it was using perjured testimony").[4]

Taylor cites to *Banks v. Dretke*, 540 U.S. 668 (2004) in support of his argument that testimony from an informant like Sparks who is paid or otherwise receives some benefit for testifying is "inherently unreliable." R. 4 at 20. In *Banks*, the Supreme Court held that the petitioner was entitled to habeas relief based on a *Brady v. Maryland*, 373 U.S. 83 (1963) claim that the government failed to disclose that a witness accepted money for his testimony. Taylor quotes *Banks* on the "broad latitude" the Supreme Court has allowed defendants "to probe [informants'] credibility by cross-examination and have counseled submission of the credibility issue to the jury with careful instructions." *Id.* (quoting *Banks*, 540 U.S. at 702 (internal quotations omitted)). But *Banks* does not change matters. Starks was subject to cross examination during which he was questioned about inconsistent statements made before the grand jury in Taylor's case, and the jury was counseled by the court on both its prerogative to judge the credibility of witness testimony based upon prior inconsistent statements, and to consider Starks's testimony "with caution and great care" because he had received immunity. *See* 10 CR 239, R. 110 at 141-167, 285; *Id.* R. 111 at 37-38, 41-42. (And again, Taylor has not alleged knowledge on the Government's part in any case.)

---

[4] Even if the Court concluded that Starks's 2017 statement was credible and that the Government had knowledge that Starks's trial testimony was false, Taylor still would need to demonstrate a likelihood that the jury's judgment would have been affected absent Starks's testimony. As discussed in Section I(B) *supra*, the Court does not believe that he could.

### B.    Ineffective Assistance of Counsel

To succeed on an ineffective assistance claim, a petitioner must show that: (1) counsel provided representation that "fell below an objective standard of reasonableness" (performance prong); and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (prejudice prong). *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1994). The *Strickland* analysis begins with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "an objective standard of reasonableness" applies. *Id.* at 689. Taylor argues that his trial counsel's performance was ineffective in two ways. First, that counsel failed to adequately respond to the Government's expert testimony on forensics. Second, that counsel failed to present adequate mitigating evidence at sentencing. The Court addresses each below.

### 1.    Failure to rebut expert testimony

Taylor contends that his trial counsel was ineffective because he failed to investigate Taylor's defense and present expert testimony to rebut the Government's expert gun shot residue and tool mark testimony. R. 4 at 21-22. Specifically, Taylor argues that his trial counsel had a duty to present an expert to testify to the "junk science" nature of tool mark testimony, alternative interpretations of the gunshot residue and tool mark testimony, and to raise a *Daubert* challenge as to both. *Id.* at 22. Taylor refers to a white paper on forensic sciences that he alleges was "widely available," critiques "junk science" such as tool mark identification and ballistics

analysis, and was cited in federal court decisions at the time of Taylor's trial. *Id.* (citing Strengthening Forensic Science in the United States: A Path Forward, the National Academies Press (July 2009)). Taylor apparently suggests that the mere existence of this paper is evidence that his trial counsel should have done more.

Taylor's argument again fails. "[A] petitioner alleging that counsel's ineffectiveness was centered on a supposed failure to investigate has the burden of providing the court sufficiently precise information, that is, 'a comprehensive showing as to what the investigation would have produced.'" *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003) (quoting *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1133 (7th Cir. 1990)). A petitioner who merely speculates does not carry his burden. *See Long v. United States*, 847 F.3d 916, 922 (7th Cir. 2017) (no relief under Section 2255 where "although [the petitioner] faulted [trial counsel] for failing to investigate, he never allege[d] 'what the investigation would have produced.'" (citing *Richardson v. United States*, 379 F.3d 485, 488 (7th Cir. 2004) (per curiam))); *see also Kratz v. United States*, 79 Fed. Appx. 932, 934 (7th Cir. 2003) (no relief under Section 2255 where petitioner offered mere "speculation" about what an investigation by counsel would reveal, because "[w]ithout identifying what evidence an investigation would have uncovered, [a petitioner] cannot show that his attorney's failure to conduct an investigation was objectively unreasonable."). And nor is "the absence of a defense expert . . . sufficient to establish that counsel's performance was deficient." *Ellison v. Acevedo*, 593 F.3d 625, 634 (7th Cir. 2010). Instead, "the

defendant must demonstrate that an expert capable of supporting the defense was reasonably available at the time of trial." *Id.*

Other than to suggest that there may be some alternative explanation for the forensic evidence in his case and asserting that a white paper *may* call certain evidence into doubt, Taylor has done nothing to further his claim. Taylor suggests no alternative interpretation of the Government's forensic evidence and fails to allege what evidence an investigation into alternatives would have revealed. And he fails to identify an expert who would have been available at trial and able to present any alternative interpretation or evidence. What is more, Taylor's trial counsel cannot be said to have sat on his hands. Indeed, he cross examined the Government's expert witnesses and argued during his closing that the gunshot reside testimony was unreliable in any event.

Taylor's reliance upon *Thomas v. Clements*, 789 F.3d 760 (7th Cir. 2015) does not change the result. There, a specific expert was identified and shown to be both available and capable of competently testifying in support of petitioner's defense at trial. 789 F.3d at 772, n. 2. Accordingly, having failed to establish *Strickland*'s performance prong, Taylor's first ineffective assistance claim fails on the merits, even if it had been timely.

## 2.    Failure to present mitigating evidence at sentencing

Taylor also contends that his trial counsel failed to investigate and present mitigating evidence at sentencing in violation of his Fifth and Sixth Amendment rights. R. 4 at 23-24. Taylor argues that his history of childhood sexual abuse,

addiction to drugs and alcohol, that he was largely unsupervised as a child, experienced "all the deprivations of growing up in poverty," and that he witnessed his stepfather abusing his mother, compelled trial counsel to submit additional evidence in the form of medical, psychological, drug treatment, school or prison records. *Id.* at 24. Taylor also complains that no psychological evaluation or interview of any family member, teacher or friend was completed prior to sentencing. *Id.*

Taylor's second ineffective assistance claim fails for the same reason as the first: Taylor presents mere speculation that additional investigation and evidence may have helped his cause. He only *suggests* that records *may* have helped, and that a psychological evaluation *might* have diagnosed him with a "mental health condition," without more. But as already established, this is not enough. *See Hardamon*, 319 F.3d at 951 (7th Cir. 2003) (ineffectiveness based on failure to investigate must provide "sufficiently precise information, that is, 'a comprehensive showing as to what the investigation would have produced'" (quoting *Gramley*, 915 F.2d at 1133)). And this is not a case in which trial counsel failed to present *any* mitigating evidence. Taylor's trial counsel spent significant time and space addressing mitigating factors in both the written submissions to the trial court and at the sentencing hearing. Indeed, counsel dedicated several pages of his sentencing position paper to Taylor's difficult childhood, lack of a stable (and non-abusive) father figure, the "rampant violence" in the "high crime area" where he lived, his mother's struggles with addiction as well as his own, his poor education, his financial support of his ten-year-old daughter, and the fact that he helped care for his autistic nephew

(among other things). *See* 10 CR 239, R. 91 at 6-10. Taylor's position paper also referenced interviews with his mother and Taylor himself. *Id.* At the sentencing hearing, Taylor's trial counsel again described Taylor's tumultuous childhood, drug and alcohol abuse and addiction, and dedication to his family, among other things, as did Taylor himself. *See* 10 CR 239, R. 112 at 21-23, 35-38. Taylor admits that these factors were placed before the trial court by counsel. R. 4 at 24. What is more, the court considered and expressly referenced all of these factors—including those which Taylor argues raised questions about his mental health—after reading the parties' written submissions and hearing from the prosecution, Taylor's trial counsel, and Taylor himself, and before determining Taylor's sentence. *See* 10 CR 239, R. 112 at 39-41, 44-45, 47-48.

Taylor relies on *Hall v. Washington*, 106 F.3d 742 (7th Cir. 1997), but that case is easily distinguished. There, the court held that "in the context of a capital sentencing hearing," counsel must make "a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors." 106 F.3d at 749. The court concluded that trial counsels' representation at sentencing "'amounted to no representation at all'" for two reasons. *Id.* (quoting *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989)). First, counsels' "total failure" to contact the defendant prior to sentencing and their "consequent failure" to present mitigation witnesses, and second, their failure during closing argument to offer any reason "other than blatant disregard of Illinois law" for sparing the defendant's life. *Id. Hall* does not require

more of Taylor's trial counsel. Even setting aside for the moment the fact that this is not a capital punishment case, Taylor does not contend that his trial counsel failed to contact him prior to sentencing, that he failed to present any specific witness, or that he failed to offer reasons in mitigation of his sentence. And the other cases Taylor cites (but does not discuss)—*Wiggins v. Smith*, 539 U.S. 510 (2003) and *Stewart v. Gramley*, 74 F.3d 132 (7th Cir. 1996)—are also capital punishment cases and inapposite. Though Taylor attempts to liken his sentencing and his counsel's obligation to that in a capital punishment case because his sentence is "effectively a life sentence, sealing [his] fate forever," the Court is not convinced. *See United States ex rel. St. Pierre v. Cowan*, 2001 WL 1001164, at *12 (N.D. Ill. Aug. 27, 2001) (at sentencing, "counsel is under a greater obligation to discover and evaluate potential evidence of mitigation . . . This is especially true where the defendant faces the death penalty" (internal citations omitted)). "[E]ven incarcerated movants must 'demonstrate, with some precision, the content of the testimony [the potential witnesses] would have given at trial." *Kratz v. United States*, 79 Fed. Appx. at 934 (quoting *United States ex rel. Cross v. DeRobertis*, 911 F.2d 1008, 1016 (7th Cir. 1987)). Taylor's vague assertions—without more—are insufficient to overcome the "strong presumption" that his trial counsel's conduct "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89. Simply put, Taylor has not established that trial counsel failed to conduct a thorough investigation, let alone how additional efforts could have changed the outcome here. Accordingly, having failed to establish either *Strickland*'s performance or prejudice

prong, Taylor has not shown that his counsel was ineffective at sentencing, and his claim fails.

## III. Evidentiary Hearing

No evidentiary hearing is called for here because Taylor's motion, the files, and records in this case conclusively show that he is not entitled to Section 2255 relief, and his allegations are merely vague and conclusory. *See Long*, 847 F.3d at 920 (7th Cir. 2017) ("[A] district court need not grant an evidentiary hearing if 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief,' or 'if the petitioner makes allegations that are vague, conclusory, or palpably incredible, rather than detailed and specific.'" (quoting *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015))). Accordingly, Taylor's request for such a hearing is denied.

## IV. Certificate of Appealability

Taylor did not request a certificate of appealability. Under 28 U.S.C. § 2253(c)(2), a petitioner is entitled to one only if he can make a substantial showing of the denial of a constitutional right. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). A petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). As shown, Taylor has not made a substantial showing that reasonable jurists could debate whether his

motion should have been resolved in a different manner. Therefore, the Court declines to certify any issues for appeal under 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For these reasons, Taylor's petition for relief under Section 2255, R. 4, is denied. The Court declines to issue a certificate of appealability.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated:  April 4, 2019